Good morning. May it please the Court, Cal Potter of Las Vegas representing Louise Thurston. In knowing that the Court is familiar with the facts of this case, I would like to focus on why the District Court erred in failing to follow the Ninth Circuit law of San Jose Hells Angels versus the City of San Jose and instead relied upon the Fourth Circuit case of Altman. Our case in Las Vegas deals with a search warrant situation and the Ninth Circuit in San Jose Hells Angels likewise was dealing with a search warrant situation where in fact there was opportunities and knowledge in both instances that there were dogs on the premises. Particularly in the search warrant plan, the evidence shows that in fact during the surveillance that was done on the property, there was a determination of the two dogs. Can I just stop you there? Yes, sir. I know you want to address that San Jose case, but I guess the problem I'm having with your argument is this, so just help me as a factual matter. When the two officers who are, I guess they're guarding that back door or they're standing, you know, trying to see if anyone will come in through the back door, is there some reason why they should have known that the dogs could get in when they're standing there? Based upon the fact that there was a conversation, they knew with the conversation with Ms. Thurston that in fact the dogs, they asked her specifically whether her dogs would bite or not. So the opportunity there. Okay. That's a different point than the question I'm asking. Right. I remember they asked, can your dogs bite, and they asked it in a nasty way, if I remember. But I'm saying when they're standing there and they know that the dogs are out there because they can hear them barking, maybe they can even see them pacing around, but is there some reason why they should have known that the dogs were going to be able to get in on their own, even though the door was closed? Well, I think what's we look at in terms of, yes, the answer is yes, you should have been able to based upon the fact that you know you have dogs on the property. And inherently. Well, dogs don't normally, hang on, counsel. Dogs don't normally walk up to doors and open them and let themselves in. So if, I mean, I'm just saying if there's something in the record you can point us to, great, but otherwise I would assume officers who see a shut door, dogs on the other side of it, are going to think, okay, well, we're safe, because they're not going to be able to get in. No. I think what's important, Your Honor, is that you look at the facts that you have dogs on the property, such as they did in the Hells Angels case. You set yourself up for an opportunity of failure in the process if you assume that dogs aren't going to bark, aren't going to protect their property. And the statement was they were going out. One officer testifies they were going out. Another says the animals were coming in. If you freeze frame, which is what you're doing, that's the police department's position in the case. The plaintiff's position, which should be granted in the light most favorable to the plaintiff at the time of the summary judgment, is that you have to go back to the time of the planning. If you set yourself up and freeze frame and get into the myth of split-second decision-making, then you rule the way that you rule or the way that you're asking the question. But clearly, the Ninth Circuit has previously looked at that issue and made the determination in the San Jose Hells Angels case that you have to do much different. Yeah. That case was very different, though, both in terms of the amount of time that the Whereas here, I just see two officers aware that dogs are there, thinking that they're inside the house and that the dogs can't get in. The dogs were initially in the house, and that's part of the testimony that they weren't a problem at that point. What's important is there was no effort made whatsoever to have animal control there at the time to make some type of determination that you would deal with the dog, or you would have to have a situation where you would use less than lethal whether it be pepper spray, tasers, things of that nature. You always have that. Instead, what the court looked at, what the district court looked at, is the Altman case from the Fourth Circuit, which is a non-search warrant-type case. And then it falls within the parameters that you're talking about. In that instance, you had animal control officers, dogs at loose, and a statute in or if they were just running loose, then you could either attempt to hold the dog or use lethal force at that point in time. So what you have is a situation that the court, the district court, decided they would follow the Highpoint, and the Highpoint case talks about what had gone on in the Ninth Circuit. They were trying to wrestle with the issue of whether, in fact, an animal, a dog, a dog was entitled to the Fourth Amendment, whether they were property or an effect, and therefore, you have a situation. But I think what's important in terms of the court looking at this is that the officers, in effect, left themselves without any option but to kill the dogs. And that's what happened in this case. Well, I guess it would be different, I think, if the officers had run out into the where the dogs were and deliberately provoked a confrontation and that shot them. That would be one thing. I would agree with you completely. Well, how is it any different than, Your Honor? Because that's what happened. They were going out into the backyard, and, of course, that was part of the search premises. The issue here, and I think what San Jose Hells Angels stands for, is the proposition that if you're going to do search warrants, these are trained professionals. They do search warrants all the time. Clearly, the testimony from the officers, the three shooters as well as the sergeant, is that they shoot dogs, they had shot dogs on prior occasions. So when you write on your search warrant plan that we know that we have to have animal control, the reasonable inference is the only reason they need animal control is for the purposes of picking up the bodies, which is what they did after they shot these two dogs. So you have a situation where a policy in practice only stops if the courts say that that is improper to go ahead and just kill dogs. Mr. Potter, was Mr. Thurston in the house, or was it just Mrs. Thurston and her daughter in the house? Mrs. Thurston and her daughter were in the house. Okay. So Mr. And that's all those were the only people there other than the officers? Correct. So it was a situation similar, you know, in the Hells Angels case. They were doing warrants on a murder that had occurred either in the Santa Clara, San Jose area. Here it was involving a robbery of an armored car that her husband had been involved with. But clearly she was not the target of the search. She was in a situation where she was in the kitchen, asked, was asked by one of the police officers whether in fact her dogs bite. She said, no, do you want me to put them up? They didn't do that. And so what What did that comment mean to you, put them up? What did that mean? To chain them up or to make sure that they weren't a problem. And that's the reasonable inference from the plaintiff's side. So instead of doing that, instead of putting the dogs up, then they invite themselves into a planned disaster situation, which is what occurred here. They didn't do the necessary proper surveillance and prophylactic measures in terms of They talked about they had this loop that they had used on some prior occasions, that they in fact had had low lethal. And so those are the options that you would use, not only for, you know, they testified that they used that low lethal shotgun to shoot people if they run from the premises. So it certainly could have been used in this situation for a dog or a taser. But when you plan and don't plan to take a less lethal manner of action, executing the warrant, then that's why you have shootings. That's why you have in this particular instance, I think, a pattern of conduct of shooting dogs during searches. And so I would ask the Court to reverse and remand based upon that, as well as the other holdings in Diorio v. Rutherford, and I'd like to reserve my time. Okay. Thank you, counsel. We'll hear from counsel for the defendants. Good morning. Good morning. My name is Bethany Rudd-Sanchez. Joining me is Sandra Douglas-Morgan. Together we are counsel for all the defendants in this case. We'd like to reiterate all the arguments set forth in our briefing, but would like to focus on a few key issues this morning. As you alluded to this morning, at its core, the appellant's 140-pound mastiff and 70-pound pit bull viciously, suddenly, unexpectedly attacked police officers while serving a valid high-risk search warrant at the home of the appellant and her armed robber husband. What do you mean attacked? What happened that you would describe as an attack? And this goes right toward Judge Watford's earlier line of questioning. The two officers, Officers Taylor and Rockwell, are standing, guarding a door. And now it's a piece of plywood. There's a spring on the top. There's no handle. They can hear the dogs, and you can even hear this on the dispatcher recording. In fact, for your ---- because the fact issue is the appellant tries to make really a fantasy here, and there's at least some argument that the attack didn't occur, I encourage you to listen to 1305 to 1309 of the dispatch recording. You can hear the growling and the barking of the dogs. At some point, but just like you said, Judge Watford, how would they expect that the dogs were going to open that door? Well, help me with that, though, because I can't understand what this thing looked like. I wish we had a good picture of it. There's a 6-inch gap between it? There's a gap. According to Ms. Thurston's deposition testimony, this is sort of a ---- it's a piece of plywood mounted on a spring that the dogs use as sort of a doggy door, and it was the size of a normal door opening. But if you imagine down at the corner, it's sort of rounded from use from the dogs. They use their noses or their paws to open the door. Well, does it open like this, like a regular door? It opens outwards away from the officers. So there is some inference in the opening brief that the officers should have been able to shut that door in order to hold that door. But because the 140-pound mastiff tried to open with his nose, and it opened outwards away from the officers, there's no handle on that door. There's just no way for them to do it. Once the dog is getting in the house, there's nothing to do. They're not going to be able to go and close it without getting attacked. But can't they see that that dog is going to be able to get in? It doesn't sound like this was a regular door that was closed. Remember, again, this is a high-risk search warrant. They don't know that Mr. Martin, who is the appellant's husband, is not in the home. They have to be prepared to deal with an armed and dangerous suspect who's proven in the crimes he was involved in that he's not afraid to use his gun. So there are certain tactics and very strict policies and procedures about the movements and when they can move and when they can advance. So as they're holding that door, they can't move because they have to hold the door to make sure nothing comes in. Did I answer your question by giving you a better sense of the facts? Is there anything in the record that is a finding that the police officers considered themselves to be in danger from Mr. Martin? I was asking this question before because I'm trying to figure out the emergency that would have precluded the officers from taking Mrs. Thurston and her daughter outside, as they did, and having animal control go in and get the dogs as they didn't. You say in your brief that animal control was there, but my recollection is that animal control arrived to pick up the bodies of the dogs, not that they were there while the warrant was being executed. That, again, is argument put forth by the appellant, but there's no evidence in the record as to the time that they arrived. If you look actually in the SWAT warrant service plan, where it says animal control needed in that box, that box is unchecked. So if that helps you. But to go back to the beginning of your question as far as do we know the danger in the home? Is there any indication that Mr. Martin was on the premises? It's a high-risk search warrant. They believed he was there. That's his primary residence. What I was asking is, is there some finding that the officers thought he was there or they had reason to believe he was there? There was never disputed that it was a valid warrant and that it was a valid high-risk search warrant. So I don't – those facts are undisputed. So I don't know that Judge Hicks necessarily specifically said that, but there was no argument either or dispute between the parties as to whether it was a high-risk search warrant. And the reason it was a high-risk search warrant is because there was an armed and dangerous felon. So as the entry team came in, they had to have lethal weapons with them because they were expecting and planning to deal with an encounter potentially with an armed suspect. What's the time gap between the initial entry and the time when the mass thief was shot? How long a period is that? It's a short period of time. It's a short period of time. It's about – and I'm sorry. I have the citation. Ten minutes? Two minutes? One minute? 30 seconds? What are we talking about? It's about 20 minutes into it. 20 minutes? Because as the officers are going through the house. So they had cleared the house. They knew that.  They had not cleared the house. In 20 minutes, they had not cleared the house. Because they were going from room to room, and it's a – at some points, you have to have holds, and you have to wait. You just can't – it's not dynamic where they're running through the home. Again, they also took time to stop and interview Ms. Thurston because you can hear on the dispatch recording they're asking back and forth, where are the dogs? Now, they're doing this in order to be able to deal with them if they can in a nonlethal manner, which is a drastic difference from the actions of the Hells Angels case. Also remember, they're not as familiar because they have limited surveillance because they had limited time to plan. They served the search warrant the same day that it was signed by the judge, as opposed to Hells Angels, where they had a lot more time to figure out what was going on and know the size, type, location, demeanor of the dogs. The officers in this case didn't have that knowledge. But despite that limitation and the limitations of their knowledge, they brought multiple less lethal weapons to control the animals. The record shows there was a pepper ball gun, a dog catch pole, diversionary devices, and animal control officers. The problem is that because the dogs suddenly attacked them, the officers just had no option and no time to deploy any less lethal method without risking serious injury to the officers in the home. Remember, because it's a high-risk search warrant, and these are SWAT team officers that are serving the warrant, they are the entry team has lethal weapons. Because they are planning for, as I said before, or have to at least be prepared for an attack from an armed felon, they have lethal weapons. They can't go in with a dog catch pole. They can't go in with a pepper ball gun if they are expecting or afraid that they might encounter somebody with a gun or have somebody in the residence. And I would like to address the appellant's comments like, why didn't you let Ms. McLaughlin have her dogs or chain them up so it wouldn't be a problem? Again, because it's a high-risk search warrant. We had not cleared the home at that point. We didn't know who was there. We didn't know where the weapons were. We didn't know if she would be taken hostage, be wounded in crossfire, get a weapon. Kennedy. Give me the ER site for the proposition that the home had not been cleared when the officer shot the first dog. Whose deposition is that? In my the statement of facts that I provided, we talked about the detention of Ms. Thurston when they were talking here about dogs and then told her. Well, just give me the ER site. You've made several times now a very specific factual statement. What's the ER site to support it? Page 209. It's from Deposition Transparency. I don't have the transcript, so do you want the pinpoint site or just the pages? No, that's fine. It's ER 209? 209. Okay. 210. And that specifically talks about. Whose deposition is that? Ms. Thurston. Ms. Thurston is. Ms. Thurston. And the reason why I gave you that particular site is because we are still walking through the home to clear it. And at that point. She's outside when the dogs get shot. This is the pinpoint site when she's at the kitchen cabinet. This is while they're still clearing the home. You're saying the dog got shot. The first dog got shot 20 minutes after the initial entry was made. Right. Because the way that I. So who. Which officer testified that at the time the first dog got shot, the house had not been cleared? That's what I would like. I know Ms. Thurston didn't testify to that because she's outside. Let me explain the way my reasoning is that Ms. Thurston testifies that her contact with the officers lasted approximately 10 minutes. So she's calculating. That's why I'm figuring the 10 minutes. And then thereafter, they go. They proceed further into the home. I'm not even talking now about the amount of time that elapsed. I'm talking about your statement that the house had not been cleared when the first dog was shot. Only an officer is going to be able to testify to that. Ms. Thurston is not going to be able to testify to that. You're right. So who.  Give me the record site for that proposition. Well, in Officer Taylor and Officer Rockwell's proposition, they talk about standing shoulder to shoulder, guarding the door, and they're talking about they're in the process of. If you don't have a record site for it, just say that. If you don't have it, just say you don't have it. I'm not off the top of my head. I believe it's supported by the record. And in the specifically the testimony of Officers Taylor and Rockwell, I apologize. I don't have a page site. Okay. That's fine. There's no need to dance around it. Just say that. I have their deposition, so look at it. The officers knew the dogs were there. Is that right? Your Honor, the information they had, if you look at the SWAT warrant service plan, is that they knew that animals were present, but if you look in the box that's next to it, it said that it was unknown. Again, because. What was unknown? The animals. There was a check mark in the box that, yes, there were animals present, but then there's a blank where you can fill in as to the --"about the animals," and it said unknown. And the animals doesn't mean necessarily dogs? What does it mean? Absolutely. It could be most commonly dogs, but it could be something else. And in this case, there were actually five dogs in the home. I think it's important for the record that three of the dogs were unharmed. Do you think it's important for us to consider the fact that the killing of dogs by police seems to be a very common phenomenon? I'm sorry. I'm not sure I understand your question, whether it's common. Well, we have testimony, I believe, that dogs are often killed by the police. In the record here, we have some anecdotal evidence. We have Officers Rockwell and Scarelli testify both being involved in one other shooting of a pit bull that was set upon them. The only others, then Officer Rockwell also testifies to a deer that he had shot who was employed by another agency. The only other information we have in the record is Sergeant Waller who just says, yes, sometimes that we have shot dogs, but no details other than that. But, again, I'd like to put forth the proposition that merely shooting a dog doesn't necessarily mean a constitutional violation, because that is a seizure, and the question before the court is whether or not that seizure was reasonable. And I think if you look at the facts of the case at bar, especially in light of the stark contrast of all the differences in the facts in the case of the Hells Angels case, you can see by the comparison the actions of the appellees here were reasonable. Again you're well over your time at this point. Can I just ask my colleagues if you have further questions? No, I don't. No? Okay. I'm going to ask you to stop then, and we'll hear rebuttal from plaintiffs. I would just like to point out that indeed what had occurred here was there was a lapse in time. The clearing, they were doing the laundry in what they said was room number 5, bedroom number 5. Mrs. Thurston was then taken into her kitchen. But at that point in time is when the questioning takes place. There's clearly ample opportunity and knowledge at that point about the dogs. She is then taken outside. But where's the record evidence of that knowledge of the dogs? It's difficult for us to understand this form, what this form actually looks like. Is that language animal control officer needed? Is that a preprinted part of the form? You know, I really don't know, because Michael Martin and the other stuff is, and when we were questioning them in the depositions, they all seemed to have amnesia. None of them could recall anything. Okay. I just want to know what the record evidence is that they knew about there being dogs there. Right. And what we've been citing to is excerpt of record 66. Well, that's what I'm looking at. But if it's a preprinted part of the form and it isn't checked, then it doesn't show knowledge of anything. Right. Well, there was knowledge on the part of Officer Dixon, at least the questioning was dealing with Officer Dixon, that he had done the surveillance and that he had the knowledge. Sergeant Waller is the individual that is in charge, and he was the one that was being asked the questions in his deposition about whether they actually had knowledge. And he testified kind of that he believed they had knowledge. He wasn't quite sure on the specifics. And although he's the sergeant, Dixon was the one that handled the briefing. He couldn't remember what had happened at the briefing, although it could have been about the dogs. But it was based upon this search plan that they had acknowledgment, as well as the testimony of Ms. Thurston, that they asked her about the dogs. And those are the particular officers that were involved in the shooting. Thank you. Okay. Thank you, counsel. The case argued will stand submitted.
judges: Lynn, Noonan, Watford